May it please the Court, my name is Joseph Hopper and I represent the plaintiff's appellants in these actions. Plaintiffs have alleged that Tyco unlawfully maintained its monopoly in the market for pulse oximetry sensors by converting hospitals to a new proprietary technology in order to suppress impending generic competition. This case presents the important question of whether a monopolist's product design change can be subject to antitrust challenge. If it can, then the District Court's grant of summary judgment must be dismissed because plaintiffs here presented substantial evidence in support of their claims that the Oximax technology was not a superior or sufficiently innovative product that would outweigh the destructive effect Tyco's Oximax strategy had on competition. The District Court improperly decided these disputed issues of material fact that should have been left for the jury. I should note that this Court very recently considered a related challenge to Tyco's conduct in Massimo v. Tyco that was decided on October 28th. The issues and competitive impact of the conduct challenged in the two cases, however, is decidedly different. In Massimo, an excluded competitor challenged Tyco's exclusionary contracting practices that restricted its ability to compete in the market for pulse oximetry monitors. Plaintiffs here are consumers of pulse oximetry sensors, and the conduct challenge in Massimo represents only the tip of the iceberg of the anti-competitive conduct that plaintiffs have challenged that led to the virtual absolute exclusion of generic competition. The issue of generic competition was not even addressed in the Massimo case. With respect to the standard that the Court should apply, I think that the parties as well as the District Court agreed that the test set forth in Calcom v. IBM is appropriate. And in that case, the Court wrote, the test is whether the defendant's acts, otherwise lawful, were unreasonably restrictive of competition. Plaintiffs respectively submit that the District Court misapplied this test by treating the plaintiffs' claims as if they were based on a duty to deal. And as this Court made clear in both Calcom and Oahu Gas, where the monopolist has no duty to deal or help its competitors, the reasonableness of its conduct in that regard does not present a jury issue. Unlike the situation in Calcom or Oahu Gas, however, plaintiffs have never alleged that Tyco had a duty to deal with its generic competitors or that Tyco was required to make its new Oxymax technology available in an Arcal-compatible format. Moreover, plaintiffs have not alleged that it was Tyco's mere introduction of the new proprietary technology that violated the antitrust laws, but rather Tyco's overarching Oxymax strategy that involved the discontinuation of the Arcal technology as well as the attempt to purge the market of Arcal-compatible monitors that gave rise to the violation. And in this regard, I respectfully submit that the plaintiffs' evidence was consistent with this Court's holding in foremost pro color v. Kodak, where the Court recognized and held that we do not, of course, hold that product innovation is immune from antitrust scrutiny. In all cases, however, and I quote, it is not the product introduction itself but some associated conduct that supplies the violation. Here, plaintiffs submitted substantial evidence setting forth in chapter and verse the associated conduct involving Tyco's attempts to flush the market of Arcal-compatible monitors prior to patent expiration that was essential for its scheme to suppress generic competition. Mr. Opper, suppose the Oxymax, is that what you call it? That's the new technology. New one, yeah. Suppose that was really an improvement over the R2 or whatever the earlier model was and that the agreements that were entered into Tyco with the people to whom it sold the slips, the use of the razor blades that go in there, that the people could get out of those, the customer could get out whenever they wanted to, which I think is different from Maximo, was that? Maximo. Those exclusionary contracts were what was, that was the essence of the Maximo case. That's what I'm thinking. Now, here, the people could get out, but the buyers could just simply decide they wouldn't buy anymore and they would buy from competitors. Well, that is one of the disputed issues, and plaintiffs have maintained the same position that Maximo has in its case. And in Maximo, the Court affirmed that those type of contracts were the equivalent of exclusionary conduct and that the consumers or the contracting parties were effectively unable to get out of them. And in Maximo case, the Court just affirmed the reasonableness of the jury's decision with respect to that, whereas in our case, the Court held that it didn't even submit, it didn't even rise to the level of a jury issue and dismissed those claims on summary judgment. But more importantly, that particular conduct was really just one aspect of what we challenged with respect to the pulse, the Oxymax program. And Your Honor indicated at the beginning of this question, well, what if it was a superior technology? You know, what would the effect of that be? And I submit to the Court that that was the key issue of fact that should have been left for the jury, whereas since the issue of how superior or innovative the Oxymax program really was, was hotly disputed by the parties. But suppose that was properly found. Now, I know you contend it wasn't, but suppose that was properly found, there really was an improvement to the product. Do you still have your Section 2 claim, or is that gone? Well, Your Honor, I have some difficulty with the Court's questions, because I'm not sure how in a summary judgment that could be properly established. I understand. For example, there's a patent. They got a patent on this new stuff. Doesn't that sort of give them a leg up on the question of whether it's innovative or new? I don't think it does, Your Honor. And that was an issue that was raised by the district court. It was not an argument that Teichel ever asserted. And in our brief, we refer to the C.R. Barr case that comes out of the Federal Circuit, which is the circuit that was created to decide issues of patent law. In a comparable case having to do with a biopsy gun, they said that they found that they affirmed a jury verdict that a change to the system such that a competitor could not use its needles even amounted to an antitrust violation, even though the defendant's products were patented. So the mere existence of a patent does not in any way foreclose plaintiff's claims here. Well, it may not foreclose it, but I mean it's certainly some strong evidence in their favor, is it not? Doesn't it imply that it's new, it's innovative, it's not obvious, it's whatever, you know, whatever? Your Honor, I'm not sure that there is any presumption when the patent office issues a patent that it is an improvement over an existing technology. Well, what is a patent then? That's exactly what it is. Well, no, I think it's a patent that no one else uses this particular process, but it's no determination that that process is better than anyone else's process. Moving on with respect to what we contend was the impropriety of the Court's resolution of disputed issues of fact, again, the key issue in this case was whether the Oxymax program was truly a superior product or an invalid product. Again, the plaintiffs submitted substantial evidence that we believe hotly disputed this contention as well, including expert testimony. The Court nonetheless determined and wrote in its decision, and I quote, the Court must conclude that Tyco's Oxymax technology, its sensors coupled with changes in the monitors, represented a superior and more sophisticated offering than previous generation Arcal systems. This conclusion from the Court was all the more inexplicable because it had agreed that the Oxymax platform was no more accurate in measuring a patient's blood oxygen levels than the preexisting technology. Maybe so, but it did other things, right? Well, Your Honor, yes, it did other things, but we disputed the benefit of those, and our experts disputed the benefit of those things. One thing was the sensor event reporting. This would enable the recording of prior incidences involving the oxygen pulse oximetry levels. Tyco's own documents indicated that no clinician had ever looked at trending or sensor event reporting on current oximeters over their careers. So even though Tyco touted this as a new and improved benefit to their latest and greatest technology, that, too, is an issue of fact, and, in fact, the contention was disputed by their own documents. But if it wasn't something that the consumer wanted, that the hospitals and the other medical facilities wanted, these additional features, didn't they have the option to stick with their old Arcal unit or buy a competitor Massimo unit? So by virtue of the fact that the consumer was purchasing it, doesn't that indicate that they wanted the additional features? Not necessarily so, Your Honor, because one of the means that Tyco employed to purge their Arcal-compatible systems from the market was their co-op equipment licensing program. Under that program, Tyco offered to give hospitals essentially a free monitor. It could just be one free monitor or how many monitors they wanted. And in order to receive that monitor, the hospital had to commit to purchasing all of its sensors from Tyco. So even if there were Arcal-compatible monitors still in the hospital, the hospital could not purchase a generic because it was locked in to buying Tyco's sensors. And Tyco's documents itself explain how this particular program was very effective in locking in their monitor base to the new technology, and they referred to this particular area of their market as protected. Your Honor, I notice you have about three minutes left, and you're welcome to use them or reserve them as you wish. Well, if I could just have a minute on class certification. I think that we've also appealed the court, abused its discretion by applying the wrong standard and imposed an impossible burden on plaintiffs with respect to antitrust injury. Proponents of the class do not have to show at the class certification stage that virtually all class members were impacted or injured. That, of course, would be an impossible task. What the plaintiffs' economists did show was based on Tyco's own forecasting documents, what the competitive price would have been, comparing that to the prices that consumers actually paid, that there was a substantial overcharge, and that Tyco had forecast that the competitive price, the sensor price, would be $6. Plaintiffs' experts determined that out of the entire class of thousands of members, there were only three potential hospitals that on average paid less than that. If that was, in fact, the case, those hospitals would not be entitled to recover damages, but that is not a basis for denying class certification. Also, a theme running throughout Judge Fowler's decision was that somehow small hospitals are going to be better off in a world in which Tyco is the monopolist than in a competitive market. And then even though plaintiffs submitted substantial evidence that the smallest hospitals paid the highest prices, Tyco repeatedly contended that in the Buffalo world, that we, of course, cannot quantify, there might have been some small hospitals that might have ended up paying, again, more higher prices in a competitive market than they would have paid in a monopolized market. And I'll reserve the rest of my time. Thanks, Mr. Hopper. Good morning. Good morning. Theodore Olson on behalf of the appellees, Tyco and Mallincott. Let me focus, if I might, on the issue that consumed most of the time so far this morning, the changes in the products, the sensors and the monitors, were significant, genuine changes. It moved the digital chip from the monitor to the sensor. That made a significant difference in the sense that sensors can now be changed, new sensors can be brought in, new sensors can be developed without having to modify, change, or somehow replace the more expensive monitors. The changes that were made in the sensors allowed new sensors to be developed, the MaxFast sensor, the Softcase sensor. The appellants argue about whether or not these changes were sufficiently innovative. They say that phrase, sufficiently innovative, over and over again in their briefs. But what Judge Felser did was examine the undisputed facts about what actually changed. There was a significant material change in the design of the platform. That design of the platform then allowed for new innovation. It also contained various such things, features, such as event reporting and sensor messaging that would tell if the sensor wasn't working, why it wasn't working. The event reporting allowed the sensor to report what had gone on with that particular patient. So if a patient had to move from one room to another room in the hospital, the sensor would go along and plug into a different monitor, but the sensor would contain the memory of what had happened with that particular plaintiff. Now, what the appellants have done is argue about, well, that wasn't sufficiently meaningful, that wasn't sufficiently innovative. And that would invite, there's no question that these were real changes that made differences in the product. People bought these changes because they were easier somehow for some clinicians to work, maybe nurses who were less experienced than doctors to work with the instruments, could read them more easily or could follow what was happening more readily. So those were significant changes. What appellants would want is for the court to make some sort of a balancing test with respect to, well, how good was it, how much material difference did it make for patients, for example, or in the competitive marketplace with respect, compared to what the damage was. But this circuit has been very careful in the CalComp case, in the Foremost case, and the Oahu Gas case, which appellants acknowledge to be the principal cases that guide the judgment of the court in this case with respect to what happens when there's a significant material change in the design of the product. The CalComp case was a directed verdict. The accusation in that case was that there was technological manipulation, the same sort of thing that is being alleged here. In the Foremost case, the same kind of allegation was made, technological predation. In the Oahu Gas case, the allegation was, well, you just did it to prevent competition, to hurt your rival. You didn't do what you could have done to help your rival. In all of those cases, in 79, 83, and 87, this circuit held that when there is a real change in the product, the court does not indulge in that kind of a balancing process. What the language in the CalComp case was, there is no issue to go to the jury. If it's a reasonable change, an actual change in the product that makes a big difference, the courts are not going to get into this balancing thing because courts are not really qualified to do that, to measure what should be done in the marketplace and what shouldn't be. If the courts ever do get into that process, that in and of itself chills the innovator. The courts are not engineers. The courts are not innovators. With all due respect to those of us in the legal profession, the marketplace works. People don't want to be in the marketplace and saying, what's going to happen to me five years later when someone brings an antitrust case and someone says, well, you thought that was going to be a change in the product. You thought that was going to be better and the way it would work, but it really isn't and it's sufficiently foreclosed competition because your competitors couldn't qualify in the marketplace to compete well with that product. In all three of those cases, the courts were clear. The courts made it very clear, it seems to me, that unless it was completely pretextual, which there really can't be any argument about in this case, that that's the end of the line with respect to that inquiry. What do you have to show, just that it's different, that it's improved, that it's changed? What do you have to show? I think that all you have to show is that it's a genuine change in the product. Suppose you painted a different color. Well, maybe that would make it more attractive in the marketplace. What the court said in Oahu Gas is that is there a legitimate business justification? I mean, we've seen with these iPhones and so forth that now this is a totally different product, but who would say, well, you made it more sleek or you made it curved or you made it chrome rather than black, that that's not a sufficient change. So I suppose that there could be situations where it was absolutely, it degraded the product and there was no justification whatsoever other than anti-competitive reasons. I guess I'm trying to play out, if you show in summary judgment that the product has changed, is that the end of the ballgame and is there any way that they could defeat summary judgment? I do not believe so. I believe that's the teaching of Cal Comp Foremost and Oahu Gas, that if there's a legitimate business justification. Again, it's possible that something could be a complete canard, absolutely false, a clear pretext, but that's not the teaching. I mean, the teachings of those three cases and other cases that go along with it are that if it's significant or an actual change in the product that is arguably justifiable, then the courts don't get into that balancing process because it's a thicket from which you can't come out. But in this case, as of the items that I've mentioned, and Judge Felser, I must say, did about as thorough a job as you could possibly do in analyzing the product, where it would work, and analyzing the allegations and the assertions that the appellants came up with, said there's a real question of fact about this, a question of fact about that. Judge Felser looked into all of those things and said, I understand what you're saying, but these are real actual changes in the product, and I can see that. Anyone can see that. With respect to the- What about the marketing? Was there something anti-competitive about tying, here's a really expensive, free, brand-new oxy monitor or oxymeter, but you have to buy all your sensors from us from here on out, whatever kind you use. Well, those are the- Yes, I was going to turn to that. And the market that I- What appellants complain about are the market share agreements and the sole source agreements. The sole source agreements, by the way, were involved in about 13% of the marketplace. The market share agreements, both of those types of agreements, those types of marketing plans were completely voluntary. They were distinguished by Judge Felser on page 8 of her opinion that analyzed this. That's page 54 of the excerpts from the record. She went systematically through the difference between what she had found in the earlier Massimo case, and I mention this because my colleague for the appellant did mention it. She systematically went through the differences between the situation that existed in the Massimo case and the situation that existed here. They were all voluntary. They were terminable at will. They didn't require anybody to buy anything. The co-op agreement that you get a bargain on the monitor and then you get a discount on the censors, that was completely voluntary. And parties could back out of that when they wanted. And ultimately, and it's important in context of this Court's jurisprudence, every discounted price, all those did was produce discounted prices. So someone could say, I can compete with that. If I can compete on the price and the product is just as good. The hospitals had complete freedom to do whatever they wanted with respect to that. And the discounted price was not below cost. It was above cost. It was, even the appellant admits, it was a supra-competitive price. So the discounted prices were discounted to levels above cost, so a competitor reasonably, if it had a comparable product, could come in and compete on cost. And Judge Felser pointed out at that page, at that point in her analysis, that what happened in the Masimo case is the installed base sort of, and the provisions in two of those contracts that prevented people from switching, required them to purchase products, were completely different. The installed base, she points out in line 16 to 18 of that opinion, that very installed base, now that it's gone, is a reason to foster competition. It gives the opportunities to compete. With respect to the class certification issue, which is the third major issue addressed by the parties in this brief, I think the most important point to make here is that Judge Felser had to find that the appellants had made the case that they could qualify under Rule 23, the four provisions of Rule 23A and one of the two provisions of Rule 23B. She had to find that those conditions existed, that those factors had been established. And she's required by the law of this circuit and practically every other circuit to conduct a rigorous, factual, independent investigation to analyze what the experts or other proffers may have produced with respect to those various different factors and systematically look at it. And she is the district judge. She's going to have to manage that case. Is it going to fit all of those qualifications or is it going to be unmanageable as a class action device because the absent members of the class are not going to be adequately represented because the present members or the named representatives of the class aren't typical and can't properly represent because the predominant issues of proof are not going to be the same for all class members so it becomes impossible to manage? Here what Judge Felser did, and she's entitled to considerable deference, you have to establish an abuse of discretion only in order to overturn her decision. I submit here's an experienced district judge who's handled many, many, many of these cases who in particular here was familiar with the industry and was familiar with the parties because she'd handled the Massimo case and she documents page after page after page a thorough analysis of what the allegations are and how manageable this case is going to be. She pointed out that there are different types of censors. There's different types of purchasers. There's differences between the direct purchasers and the distributors. There's different times because the competition changed in the marketplace. There's different types of market buyers, big hospitals, small hospitals, big name hospitals like the Mayo Clinic, all of whom have different situations where the marketing would be different and the prices would be different and so she found that it was impossible to determine from what the plaintiffs had submitted that anybody could find what the actual prices were going to be or the but-for prices were going to be for any particular member of that class. She found the careful analysis that the predominant issues did not allow, were not amenable to common proof or common evidence and it was going to have to be a systematic analysis of each of the plaintiffs, ones that were represented and ones that were not represented and then she went on to find out that damages couldn't be established in that way and she looked at the doctor buyer, the expert, that had been brought forward by the petitioners, by the plaintiffs in this case, found various flaws in his methodology, in his analysis and so forth because he took certain assumptions and then he made certain extrapolations, all of which were unrealistic. In short, and so that I can conclude in time, what Judge Felser did is exactly what you would want a district judge to do. She demonstrated, she laid it all out, and she was absolutely right that for four different reasons the plaintiffs had failed to establish their burden to allow this case to proceed as a class action. It would be unjust, unmanageable, and not sufficiently established under the statute and therefore could not be. Mr. Folsom, thank you very much. Thank you, Your Honor. Mr. Hopper, you've got about a minute and change left. Thank you, Your Honor. The linchpin of the trilogy, CalComp, Oahu Gas, and Foremost, is that the antitrust violation was based on a duty to deal, that the defendant somehow had a duty to help its competitor and the courts rejected that position, rightfully so, that if there's no duty to deal, there's not a jury question as to the reasonableness of the defendant's duty to deal. We have not made that allegation here. We have not said there was a duty to deal. What happened here, that's different than all those other cases. In those other cases, there was no claim that once the monopolist introduced its new technology, it removed its existing technology. That's precisely what we've alleged here, and that's precisely the evidence we offered. In this particular case, the marketplace didn't decide which technology was better. It never had the chance. Tyco removed the technology, as we had claimed, for the potential reason of excluding generic competition. But weren't there competitors out there that were selling the old technology? The old technology was, the hospitals had the old technology that Tyco had licensed, and as I mentioned, you know, they slowly moved, even before the patent expired and they launched Proximax, they discontinued making the old technology, forcing the hospitals to buy the new technology. They changed, also, as I mentioned, the co-op equipment purchasing programs that restricted a hospital to buying only Tyco sensors once it had received the free monitor. Now, it cannot be the law in the circuit, and I don't think it is consistent with those three cases, that if a monopolist essentially changes the socket, and that's what we're talking here, by making it purple and changes the socket so generics cannot plug into that socket once that patent expires, that cannot be countenance by the antitrust laws, and I don't believe that it's the law in this circuit. And then with respect to the benefits that this new technology purportedly showed, again, that was a disputed issue of fact. Thank you very much. Mr. Olson, thank you as well. The case has just argued and submitted. We'll stand at recess. Thank you. Thank you.
judges: Bolton, Thompson, Silverman